No. 24-30252

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

STATE OF MISSOURI,

Plaintiff,

v.

JOSEPH R. BIDEN, JR.,

Defendant.

ROBERT F. KENNEDY, JR.; CHILDRENS HEALTH DEFENSE; CONNIE SAMPOGNARO,

Plaintiffs-Appellees,

v.

JOSEPH R. BIDEN, JR.; KARINE JEAN-PIERRE; VIVEK H. MURTHY; XAVIER BECERRA;
UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

Defendants-Appellants.

On Appeal from the United States District Court
for the Western District of Louisiana

EMERGENCY MOTION UNDER CIRCUIT RULE 27.3
FOR A STAY PENDING APPEAL

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*
BRANDON BONAPARTE BROWN
*United States Attorney*
DANIEL TENNY
DANIEL WINIK
SIMON BREWER
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*

# CERTIFICATE OF INTERESTED PERSONS

*Kennedy v. Biden*

A certificate of interested persons is not required under Fifth Circuit Rule 28.2.1 as appellants are all governmental parties.

*/s/ Simon C. Brewer*

Simon C. Brewer

# TABLE OF CONTENTS

**Page**

STATEMENT ................................................................................................................1

ARGUMENT ................................................................................................................6

I.    The government is likely to succeed on the merits. .................................................6

II.   The equitable factors heavily favor the government. ........................................... 16

CONCLUSION .......................................................................................................... 20

CERTIFICATE OF COMPLIANCE

APPENDIX

The government respectfully requests a stay pending appeal of the district court's preliminary injunction. A stay is warranted because the Supreme Court previously stayed, and ultimately reversed, an identical injunction issued by the same district court based on the same record. The Supreme Court's decision makes clear that the government is likely to succeed on appeal, and the Supreme Court's prior stay confirms that the equities and the public interest warrant a stay while the appeal proceeds. We request relief by July 24, 2024, to allow sufficient time for the Supreme Court to consider an application for a stay, should the Solicitor General elect to file one. We have sought plaintiffs' position but have not received a response.

## STATEMENT

1. a.    In *Missouri v. Biden*, No. 22-cv-1213 (W.D. La.), two States and several individuals brought First Amendment and other claims against numerous federal defendants relating to content moderation on social-media platforms. In July 2023, the district court entered a preliminary injunction. *Missouri v. Biden*, 680 F. Supp. 3d 630 (W.D. La. 2023). The court concluded that seven groups of defendants—covering (i) the White House, (ii) the Surgeon General's Office, (iii) the Centers for Disease Control and Prevention (CDC), (iv) the National Institute of Allergy and Infectious Diseases (NIAID), (v) the Federal Bureau of Investigation (FBI), (vi) the Cybersecurity and Infrastructure Security Agency (CISA), and (vii) the State Department—had violated the First Amendment by coercing or significantly encouraging platforms to moderate content on a variety of topics. *See id.* at 694-705. Those topics largely focused on COVID-19, including

vaccines and masking, as well as topics related to the 2020 election. *See id.* at 642, 728. The district court enjoined defendants from engaging in ten types of communications with social-media companies regarding their content-moderation policies and the application of those policies, subject to a series of carveouts.

b.      On appeal, this Court reversed in part and affirmed in part the district court's order. *Missouri v. Biden*, 80 F.4th 641 (5th Cir.) (per curiam), *withdrawn and superseded*, 83 F.4th 350 (5th Cir. 2023) (per curiam).  As principally relevant here, the Court held that the individual plaintiffs demonstrated standing by showing "that social-media platforms ha[d] engaged in censorship of certain viewpoints on key issues and that the government ha[d] engaged in a years-long pressure campaign" to promote content moderation on those issues.  83 F.4th at 370.  On the merits, this Court affirmed the district court's holdings that each group of defendants (except the NIAID and State Department defendants) coerced or significantly encouraged platforms' content-moderation decisions, without connecting particular communications or actions to particular content-moderation decisions.  *See id.* at 374-92.

The Court also modified the preliminary injunction to forbid defendants from taking

> actions, formal or informal, directly or indirectly, to coerce or significantly encourage social-media companies to remove, delete, suppress, or reduce, including through altering their algorithms, posted social-media content containing protected free speech[, which] includes, but is not limited to, compelling the platforms to act, such as by intimating that some form of punishment will follow a failure to comply with any request, or

- 2 -

supervising, directing, or otherwise meaningfully controlling the social-media companies' decision-making processes.

*Id.* at 397.

The Supreme Court stayed the preliminary injunction and granted certiorari. *Murthy v. Missouri*, 144 S. Ct. 7 (2023).

2.     In March 2023, while the *Missouri* preliminary-injunction motion was pending before the district court, plaintiffs in this case—Robert F. Kennedy, Jr., Children's Health Defense (CHD), and Connie Sampognaro—filed a complaint asserting substantially the same claims against the same defendants.  A1-120.  Plaintiffs allege that they have been harmed as consumers of online content regarding "COVID-19" and "governmental health policies."  A13-15.  They sought to consolidate this case with *Missouri*.  Motion to Consolidate, *Missouri*, No. 22-cv-1213 (Apr. 1, 2023), ECF No. 236. Plaintiffs also moved for a preliminary injunction, for which they "s[ought] no new discovery and submit[ted] no new evidence," instead choosing to rely exclusively on the factual record developed in *Missouri*.  A129.  After granting the *Missouri* preliminary injunction, the district court granted plaintiffs' consolidation motion and stayed proceedings in this case.

3.     On February 14, 2024, the district court granted in this case a preliminary injunction "against the same Defendants and on the same grounds as in *Missouri v. Biden*."  A248.  The court held that Kennedy and CHD "can demonstrate standing" based exclusively on the court's factual findings in *Missouri* that the White House, the

Surgeon General's Office, and the CDC had coerced or significantly encouraged social-media companies to remove content.  A235-36.  By contrast, the court held that Sampognaro could establish an injury-in-fact only based on a "right to listen" theory that asserted her interest in hearing online speech about COVID-19.  A237.

On the merits, the district court explained that because the "Kennedy Plaintiffs rely on the same evidence presented in *Missouri v. Biden*," the court would again hold that "the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the FBI Defendants and the CISA Defendants likely violated the Free Speech Clause of the First Amendment."  A242; *see also* A244.  After briefly rejecting the Kennedy plaintiffs' other merits theories, A243, and considering the equitable factors relevant to a preliminary injunction, A244-48, the court granted the same preliminary injunction that this Court had approved in *Missouri*.  *See* 83 F.4th at 397-99.

The district court recognized, however, that the Supreme Court's "decision in *Missouri v*[.] *Biden* [would] answer many of the issues raised in this case."  A249.  It therefore stayed the preliminary injunction "for ten (10) days after the Supreme Court sends down a ruling in *Missouri v. Biden*."  *Id.*

4.      Defendants noticed this appeal on April 12, 2024.  On the government's motion, this Court has held all proceedings in abeyance pending the Supreme Court's disposition in *Missouri*.  *See* Order (Apr. 24, 2024).

5.      On June 26, 2024, the Supreme Court issued its *Missouri* opinion reversing the judgment of this Court and remanding the case for further proceedings consistent

with its opinion. *Murthy v. Missouri*, __ S. Ct. __, 2024 WL 3165801 (U.S. June 26, 2024). The Supreme Court held that no plaintiff in *Missouri* had demonstrated Article III standing to seek a preliminary injunction. *Id.* at *4, *16-17.

6.    As noted, the district court's current stay, by its terms, lasts "for ten (10) days after the Supreme Court sends down a ruling in *Missouri v. Biden*." Under Supreme Court Rule 45.3, the "Court will send the clerk of the lower court a copy of the opinion … and a certified copy of the judgment" 32 days after entry of the Supreme Court's opinion and judgment. In *Missouri*, that action—the "send[ing]" down of the judgment—will occur on July 29, 2024. The government thus understands the district court's stay to last until August 8, 2024, 10 days later.

The day after the Supreme Court issued its opinion in *Missouri*, the government filed a notice informing the district court that it intended to file a motion for an indicative ruling that the court would vacate its preliminary injunction, or in the alternative for a stay pending appeal, while the district court's temporary stay of the injunction remained in effect. *See* A252-53. Plaintiffs responded by taking the position that the district court's stay would expire on July 7, 2024 (*i.e.*, 10 days after the Supreme Court announced its opinion in *Missouri*). *See* A254-55. The next business day, the government asked the district court to confirm that the current stay lasts until August 8 or, in the alternative, to extend the stay to permit orderly briefing and adjudication of the forthcoming motion for an indicative ruling or a stay pending this appeal. A257-60. The government subsequently filed its motion for an indicative ruling from the district

court that it would dissolve the preliminary injunction in light of *Missouri*, if this Court remanded for that purpose, or in the alternative a stay pending appeal. A270-288.

On July 9, 2024, the district court denied the government's motion for a clarification of the stay's expiration date, on the theory that it "lack[ed] jurisdiction to make such a determination" because this appeal was pending. A292. The court simultaneously declined to enter an indicative ruling or a stay pending appeal. *Id.*

## ARGUMENT

A motion for stay pending appeal is governed by the four-factor test in *Nken v. Holder*, 556 U.S. 418, 426 (2009). The government is likely to succeed on each factor.

## I.     The government is likely to succeed on the merits.

The government has a strong likelihood of success on the merits of this appeal. That is particularly evident following the Supreme Court's ruling in *Missouri*. That opinion makes clear that plaintiffs here cannot establish standing. In addition, the Supreme Court's analysis of standing, especially when considered together with the Supreme Court's decision in *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), makes clear that the government is likely to succeed on the merits even apart from the standing issue. In particular, the Supreme Court's assessment of the causal connections between the government's actions and the harm to social-media users would require this Court to revisit its merits holding in *Missouri*, and the Supreme Court also concluded that "many" of the critical factual findings relied upon by the district court and this Court "appear to be clearly erroneous," 2024 WL 3165801, at *9 n.4.

A.    The government is likely to succeed in this appeal because the Supreme Court's ruling in *Missouri* makes clear that plaintiffs lack standing to obtain the preliminary injunction at issue.

1.    Plaintiffs' theory of standing in this case largely mirrors the claims that were rejected in *Missouri*.  In particular, plaintiffs relied exclusively on a listener-based theory of standing that the Supreme Court rejected in *Missouri*.  That theory cannot survive *Missouri*, as discussed in more detail below.

Although plaintiff Kennedy was identified in the Supreme Court's opinion as having made social-media posts that were discussed by government officials, in this case he expressly disclaimed any standing theory based on such posts.  Plaintiffs stated, in particular, that they "bring this case not as censored speakers, but as social media users—viewers and listeners—challenging a denial of their right to receive information and ideas."  A188-89.  They have thus expressly waived any argument that they have standing based on injuries suffered in their capacity as speakers on social-media platforms.  *See Center for Biological Diversity v. U.S. EPA*, 937 F.3d 533, 542 (5th Cir. 2019) ("Arguments in favor of standing, like all arguments in favor of jurisdiction, can be forfeited or waived."); *see also Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017) ("[W]aiver is the intentional relinquishment or abandonment of a known right." (quotation marks omitted)).  Because plaintiffs affirmatively waived speaker-based arguments, the district court erred in relying on that theory to hold that Kennedy and CHD have Article III standing.  *See Missouri*, 2024 WL 3165801, at *12 n.7 (declining

to consider any injuries not asserted by the plaintiffs and noting that "[i]t is especially important to hold the plaintiffs to their burden in a case like this one"); *cf. United States v. Sineneng-Smith*, 590 U.S. 371, 375-76 (2020) (explaining "the principle of party presentation").

Even if it were possible to forgive plaintiffs' waiver, however, they still would lack standing. As *Missouri* held, plaintiffs "seek[ing] to enjoin Government agencies and officials from pressuring or encouraging the platforms to suppress protected speech in the future" face "two particular challenges": (1) they cannot rely on "'guesswork as to how independent decisionmakers will exercise their judgment,'" and (2) "they must face 'a real and immediate threat of repeated injury.'" 2024 WL 3165801, at *7-8 (emphasis omitted). Plaintiffs here fail to clear either obstacle.

First, plaintiffs have not established that any injury they claim to face would be fairly traceable to defendants' actions. In *Missouri*, the Supreme Court explained that "[t]he primary weakness in" the plaintiffs' reliance on "past restrictions" of their content by social-media platforms is that "[t]he District Court made" no "specific causation findings with respect to any discrete instance of content moderation"—in other words, no findings that any specific act of content moderation was attributable to actions by a specific governmental defendant, as opposed to the platforms' exercise of their independent judgment. 2024 WL 3165801, at *8; *see* A237-38. That is equally true of the district court's opinion as to plaintiffs here. Although Kennedy was one member of the "Disinformation Dozen" identified by certain White House officials as "responsible

for a majority of COVID–19-related misinformation" in 2021, *Missouri*, 2024 WL 3165801, at *12, the record lacks evidence establishing that any social-media company's action against Kennedy's accounts can be attributed to a governmental actor—much less any finding by the district court to that effect. Indeed, the parties did not join issue on that topic as plaintiffs expressly waived any claim to standing on that basis. *See* A144-45; A188-90.[1]

In the complaint, plaintiffs allege in conclusory fashion that Facebook "censored" Kennedy (without identifying what expression was moderated) as part of the Disinformation Dozen, A69-70 ¶ 305, but they present no allegation (let alone evidence) linking such decision to a governmental action. In fact, Facebook explained that it removed pages and accounts linked to the Disinformation Dozen "for violating [Facebook's] policies," and noted that it was not imposing a complete ban because "the remaining accounts associated with these individuals [were] not posting content that [broke Facebook's] rules." Glenn Decl., Ex. 37, *Missouri v. Biden*, No. 22-cv-1213 (W.D. La.), ECF No. 10-1. That suggests the relevant actions reflected the platform's own

---

[1] Justice Alito, dissenting from the Supreme Court's denial of plaintiffs' motion to intervene in the then-pending Supreme Court proceedings in *Missouri*, suggested that "because Mr. Kennedy has been mentioned explicitly in communications between the Government and social media platforms, he has a strong claim to standing, and the Government has not argued otherwise." *Murthy v. Missouri*, 144 S. Ct. 32, 32 (2023) (Alito, J., dissenting). That assertion did not account for the preliminary-injunction record in this case, which was not before the Court. As noted, the record reveals both that plaintiffs raised no speaker-based standing argument and that the government did contest plaintiffs' standing (whose absence, unlike its presence, in any event cannot be forfeited or waived, *see Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)).

decisions, not any governmental action. *See Missouri*, 2024 WL 3165801, at *9 ("For instance, Facebook announced an expansion of its COVID–19 misinformation policies in early February 2021, before White House officials began communicating with the platform. And the platforms continued to exercise their independent judgment even after communications with the defendants began. For example, on several occasions, various platforms explained that White House officials had flagged content that did not violate company policy."); *see also id.* at *13 n.8.

Second, plaintiffs fail to demonstrate any real and immediate threat of future injury. The Supreme Court emphasized that, "without proof of an ongoing pressure campaign, it is entirely speculative that the platforms' future moderation decisions will be attributable, even in part, to the defendants." *Missouri*, 2024 WL 3165801, at *13. And the Supreme Court concluded that "[o]n this record"—the same here as in *Missouri*, because of plaintiffs' choice to proceed on the *Missouri* record—the alleged "frequent, intense communications that took place in 2021 between the Government defendants and the platforms had considerably subsided by 2022." *Id.* at *15. But the district court focused on White House and Surgeon General's Office communications in 2021, regarding the then-acute COVID-19 pandemic, without accounting for the "considerabl[e]" change in circumstances, *id.*, by the time plaintiffs here filed their suit

in March 2023.  A235-36.[2]  As the Supreme Court concluded in *Missouri*, evidence of governmental communications in 2021 would fall far short of demonstrating a present likelihood of future injury.  2024 WL 3165801, at *15; *see also id.* at *16 (explaining that because "the Federal Government has wound down its own pandemic response measures," an injunction directed at the government "is unlikely to affect the platforms' content-moderation decisions" in the future).

2.    The government is also likely to prevail as to plaintiffs' "right to listen" theory, A237.  As the Supreme Court explained, this theory "is startlingly broad, as it would grant all social-media users the right to sue over *someone else's* censorship—at least so long as they claim an interest in that person's speech."  2024 WL 3165801, at *16.  The Court held that such a theory fails to establish an Article III injury for plaintiffs who cannot identify "any specific instance of content moderation that caused them identifiable harm."  *Id.* at *17.

In light of that holding, plaintiffs clearly have failed to establish standing to obtain the preliminary injunction issued here.  For example, the district court cited allegations that Sampognaro "is a citizen and health care policy advocate who was deprived of complete, accurate COVID-19 information."  A237.  That is precisely the kind of generalized interest that the Supreme Court held insufficient to demonstrate standing

---

[2] The district court also referenced a report produced by the nonprofit Virality Project that mentioned Kennedy and CHD.  A236.  The court's opinion did not even purport to connect that report to any past action by the government or a social-media company directed at plaintiffs, let alone a likelihood of future action.

in *Missouri*. *See* 2024 WL 3165801, at *17 (holding that the individual plaintiffs' allegations that "hearing unfettered speech on social media is critical to their work as scientists, pundits, and activists" failed to establish a concrete and particularized injury). And to the extent that the district court considered Kennedy's and CHD's assertions of listener-based standing based on their interest in hearing COVID-19-related information, *see* A13-14 (complaint); A188 (preliminary-injunction reply brief, asserting an interest in receiving "accurate information and a full range of opinions about COVID-19"), those conclusory assertions of a generalized interest in a topic fail to establish a concrete and particularized injury—let alone one traceable to defendants' actions and likely to cause future harm.

3.    At an absolute minimum, even if one of the plaintiffs could demonstrate standing as to some specific conduct by some specific defendant, the sweeping injunction issued by the district court could not stand. As the Supreme Court explained, plaintiffs must demonstrate standing as to each defendant, each platform, and each type of content. 2024 WL 3165801, at *9. The district court's generalized assertions of government-wide conduct are inadequate. And the injunction improperly covers communications with all social-media platforms and communications regarding all posts by anybody (not just plaintiffs) on all topics. *Compare id.* at *14 ("[T]he plaintiffs have only explicitly identified an interest in speaking about COVID–19 or elections—so the defendants' discussions about content-moderation issues must focus on those topics."), *with* A235-37 (concluding only that plaintiffs established injuries related to COVID-19

information).  Even if Kennedy's inadequate allegations regarding COVID-19 were accepted, for example, they would not justify an injunction regarding election-related speech, and thus would not justify any injunction against the FBI or CISA.  *See Missouri*, 2024 WL 3165801, at *11 ("[T]he record contains no evidence that either the FBI or CISA engaged with the platforms about the pandemic.").  The injunction in its current form is legally untenable and should remain stayed.

B.    Even if any plaintiff had standing, the government would be likely to prevail on the merits.  Many of the deficiencies that the Supreme Court identified with the factual showings on traceability also infect the merits, in which the state-action inquiry is whether the platforms' actions reflected a coercive threat (or comparably coercive inducement) by the government rather than the exercise of their own independent judgment.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982).  As the Supreme Court recently explained, it is perfectly "permissible" for the government to "attempt[] to persuade" a private party not to disseminate speech, *Vullo*, 602 U.S. at 188, so even a showing that platforms would not have taken content-moderation actions against plaintiffs' speech but for the government's urging would not suffice to show that those actions violated the First Amendment.  Rather, the relevant question is whether the government's "conduct … , viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech."  *Id.* at 191.  And here, plaintiffs are unlikely to be able to demonstrate on the merits that the government coerced the platforms to act, given the difficulties identified

by the Supreme Court in even establishing that the government's actions influenced the platforms. *See Missouri*, 2024 WL 3165801, at *13 n.8 ("acknowledging the real possibility that Facebook acted independently in suppressing [the plaintiff's] content").

Moreover, the Supreme Court explained that "many" of the factual findings made by the district court in *Missouri* "unfortunately appear to be clearly erroneous," and that this Court had "relied on the District Court's factual findings." *Missouri*, 2024 WL 3165801, at *9 n.4 (listing examples). Here, the district court explained that the plaintiffs relied on the "same evidence" as in *Missouri*, and the court therefore repeatedly cited "its previous ruling" throughout its opinion. A229; *see also, e.g.*, A236 (citing the court's prior factual determinations to hold that plaintiffs have standing); A244 (incorporating by reference the court's previous merits holdings in *Missouri*). A district court necessarily "abuses its discretion if it relies on clearly erroneous factual findings in deciding whether to grant a preliminary injunction." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 696 (5th Cir. 2018).

Aside from the clear error of the findings that this Court declined to disturb, this Court's analysis in *Missouri* has since been called into question by the Supreme Court's ruling in *Vullo*. The Supreme Court emphasized in that case that the relevant inquiry is "whether an official seeks to persuade or, instead, to coerce." 602 U.S. at 191; *see also id.* at 199 (Gorsuch, J., concurring). "Considerations like who said what and how, and what reaction followed, are just helpful guideposts in answering the question whether an official seeks to persuade or, instead, to coerce." *Id.* at 191 (majority opinion).

In its prior decision in *Missouri*, this Court adopted an amorphous standard that can be satisfied by government speech unaccompanied by any threat. The Court found coercion based on nothing more than strong language, *see, e.g.*, 83 F.4th at 383, and gave dispositive weight to the recipient's subjective perceptions, *see, e.g.*, *id.* at 384, 389. The Court considered not the speaker's authority to carry out a threat, but the government's general law-enforcement and regulatory authority. *See, e.g.*, *id.* at 384, 388. And the Court relied on general public statements about potential legislative changes that were not connected to any content-moderation request. *See, e.g.*, *id.* at 381-82. That analysis was inconsistent with the principles articulated in *Vullo*.

*Vullo* also makes clear that this Court's *Missouri* decision adopted an impermissibly broad definition of "significant encouragement" as an alternative to coercion, holding that it can be established merely by a government official's "entanglement in a party's independent decision-making." 83 F.4th at 375. That is not what the Supreme Court's prior cases have meant by "significant encouragement." Rather, the point of the Supreme Court's reference to "significant encouragement" alongside "coerci[on]," *Blum*, 457 U.S. at 1004, is that coercion by threats is not conceptually distinguishable from "the [government's] use of positive incentives" to "overwhelm the private party and essentially compel the party to act in a certain way," *O'Handley v. Weber*, 62 F.4th 1145, 1158 (9th Cir. 2023), *cert. denied*, __ S. Ct. __, 2024 WL 3259696 (U.S. July 2, 2024). Or as the Supreme Court put it in *Vullo*, either a "threat" or an "inducement" "can be coercive." 602 U.S. at 193.

The present factual record fails to show that the government compelled the challenged content-moderation decisions through coercive threats or comparably coercive inducements. Accordingly, even if one or more plaintiffs have standing, the government would likely succeed on the merits.

## II. The equitable factors heavily favor the government.

The other *Nken* factors likewise favor a stay pending appeal. *See* 556 U.S. at 434. In granting a stay in *Missouri*, the Supreme Court necessarily determined that the equitable factors favor the government. Although the Supreme Court's stay order did not explicate its reasoning, the Court's decision to grant the government's application indicates its view that the government would suffer irreparable injury absent a stay and that the equities and public interest favor the government. *See, e.g., Labrador v. Poe ex rel. Poe*, 144 S. Ct. 921, 922 (2024) (Gorsuch, J., concurring in the grant of stay) (noting the factors considered by the Supreme Court when considering whether to grant a stay); *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring in the grant of stays) (same). This Court has previously issued a stay pending appeal in light of "the stay granted by the Supreme Court" in a case brought by different parties challenging the same government action. Order, *Polymer80, Inc. v. Garland*, No. 23-10527 (5th Cir. Nov. 30, 2023). That approach is all the more warranted here where the government seeks a stay in a case that is consolidated with the original case and relied on exactly the same record.

- 16 -

Even if the Supreme Court's prior determination were not binding here, the equities would favor the government for the reasons that follow.

A.    Although First Amendment injuries may be irreparable when they occur, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion), the "invocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury," *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016).    A preliminary injunction is appropriate only when "First Amendment interests are either threatened or in fact being impaired at the time relief is sought." *Id.* (quotation marks omitted).

The district court did not substantiate any finding that plaintiffs face ongoing or imminent irreparable injury.    For example, it stated that "Defendants apparently continue to have meetings with social-media companies and other contacts."    A246.    But the Supreme Court noted that many such meetings stopped long before March 2023, when plaintiffs here filed suit.    *See Missouri*, 2024 WL 3165801, at *15 ("The CDC stopped meeting with the platforms in March 2022."); *id.* at *16 ("[T]he White House disbanded its COVID–19 Response Team, which was responsible for many of the challenged communications in this case.").    And even if the district court were correct that some meetings continue, the mere fact that some government officials continue to meet with platforms is irrelevant: the court "must confirm that *each* Government defendant continues to engage in the challenged conduct, which is 'coercion' and 'significant encouragement,' not mere 'communication,'" *id.* at *14.

Worse yet, the district court indicated that plaintiffs face a risk of harm from "the 'switchboarding' and other election activities of the CISA Defendants" in light of the upcoming 2024 election, despite not having concluded that any plaintiff has standing on this basis. A246. But as the Supreme Court recognized, CISA has "stopped switchboarding … , and the Government has represented that it will not resume operations for the 2024 election," meaning that plaintiffs "failed to demonstrate likely future injury." *Missouri*, 2024 WL 3165801, at *14. And the district court cited possible future harm on topics "including the origins of the COVID-19 pandemic, [and] the efficacy of COVID-19 vaccines," A246, notwithstanding that "the Federal Government has wound down its own pandemic response measures," *Missouri*, 2024 WL 3165801, at *16. That makes it particularly unlikely that plaintiffs will suffer any harm from "platforms' content-moderation decisions" on that topic. *Id.* These pervasive errors demonstrate that plaintiffs have failed to demonstrate likely irreparable harm.

B.    The injunction sweeps far more broadly than necessary to remedy plaintiffs' asserted injuries, even if plaintiffs established standing. Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). Principles of equity reinforce that jurisdictional limitation: Injunctive relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Labrador*, 144 S. Ct. at 923, 927 (Gorsuch, J., concurring in the grant of stay).

The injunction entered by the district court flouts those principles by failing to distinguish between defendants, platforms, and types of content. *See supra* pp. 12-13. That abuse of discretion alone justifies a stay. At a minimum, even if it concludes that plaintiffs established standing, this Court should stay the injunction to the extent it extends beyond government action specifically targeting content posted by plaintiffs themselves, and beyond any platforms and topics as to which the Court concludes, based on the record, that plaintiffs have not just an imminent risk of harm, as required for Article III standing, but a "'likelihood of substantial and *immediate* irreparable injury,'" as required for equitable relief, *see City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983) (emphasis added). An injunction so limited would largely or entirely eliminate any irreparable harm that plaintiffs might face without burdening a vast universe of government actions lacking any connection to plaintiffs.

C.  Unless stayed, the preliminary injunction will irreparably harm the government and undermine the public interest. *See Nken*, 556 U.S. at 435 (harms to government and public "merge"). Because the preliminary injunction merely restates the same injunction stayed in *Missouri*, it also will inflict the same harms. *See* Application for a Stay of the Injunction Issued by the United States District Court for the Western District of Louisiana at 36-38, *Murthy v. Missouri*, No. 23A243, 2023 WL 6123773 (U.S. Sept. 14, 2023). Those harms to the government—which are both certain and great—outweigh plaintiffs' asserted interests for the pendency of this appeal.

# CONCLUSION

The preliminary injunction should be stayed pending appeal.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

BRANDON BONAPARTE BROWN
*United States Attorney*

DANIEL TENNY
DANIEL WINIK

/s/ Simon C. Brewer
SIMON C. BREWER
*Attorneys, Appellate Staff*
*Civil Division, Room 7529*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 616-5367*
*Simon.C.Brewer@usdoj.gov*

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this motion complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in 14-point Garamond, a proportionally spaced font, and that it complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,949 words, according to Microsoft Word.

I further certify that this emergency motion complies with the requirements of Fifth Circuit Rules 27.3 and 27.4 because it was preceded by telephone calls to the Clerk's Office and to the offices of opposing counsel, advising of our intent to file it. I further certify that the facts supporting emergency consideration of this motion are true and complete.

*/s/ Simon C. Brewer*
Simon C. Brewer