No. 24-30252

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

ROBERT F. KENNEDY, JR., CHILDREN'S HEALTH DEFENSE,
AND CONNIE SAMPOGNARO,

*Plaintiffs-Appellees*,

v.

JOSEPH R. BIDEN, JR., KARINE JEAN-PIERRE, VIVEK H. MURTHY,
XAVIER BECERRA, UNITED STATES DEPARTMENT
OF HEALTH AND HUMAN SERVICES, ET AL.,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Western District of Louisiana

## *KENNEDY* PLAINTIFFS' OPPOSITION

**JED RUBENFELD**
**N.Y. Bar # 2214104**
**1031 Forest Rd.**
**New Haven, CT 06515**
**Tel.: 203-432-7631**
**jed.rubenfeld@yale.edu**

**G. SHELLY MATURIN, II**
**La. Bar # 26994**
**Welborn & Hargett, LLC**
**1031 Camellia Blvd**
**Lafayette, LA 70508**
**Tel.: 337-234-5533**
**shelly@wandhlawfirm.com**

*Attorneys for Plaintiffs-Appellees*

i

## CERTIFICATE OF INTERESTED PERSONS

*Kennedy v. Biden*, No. 24-30252

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of rule 28.2.1 have an interest in the outcome of this case. This representation is made in order that the judges of this court may evaluate possible disqualification or recusal:

Plaintiffs/Appellees in the instant suit:

     1. Children's Health Defense, a non-profit with no parent corporation and no publicly held corporation owning more than 10 percent stock;
     2. Robert F. Kennedy, Jr.;
     3. Connie Sampognaro

All other parties are governmental entities and individuals operating in their official governmental capacities.

DATED: September 25, 2024

Respectfully submitted,

   */s/ G. Shelly Maturin, II*

_____
G. SHELLY MATURIN, II (#26994)
WELBORN & HARGETT, LLC
1031 Camellia Blvd.
Lafayette, LA 70508
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com

# TABLE OF CONTENTS

Introduction ………………………….………………………….. 1

Statement of Facts ………………………….………………. 3

Argument ………………………….………………………… 4

I.    Standard of Review ………………………….…………… 4

II.    Plaintiffs Have Standing ………………………….……… 5

    A. Standing prerequisites established by *Murthy*…………………… 5
    B. Plaintiffs Kennedy and CHD have standing…………………… 6
    C. Plaintiff Sampognaro has right-to-listen standing……………… 17

III.    All of Defendants' Other Arguments are Foreclosed by *Missouri*… 19

IV.    Plaintiffs Have Established a Likelihood of Success on the Merits.. 23

    A.  The facts demonstrating coercion here are overwhelming……… 23
    B.  Affirmance is warranted on the basis not only of coercion,
        but of other state action tests as well………………………… 26

V.    The Equities Strongly Favor Plaintiffs……………………… 32

VI.    The Injunction Ordered Below Is in Strict Conformity with
    the Modified Injunction Ordered by this Court in *Missouri*………… 33

VII.    The Court Should Deny Defendants' Motion for a Stay
    Pending Appeal……………………………………………… 33

Conclusion……………………………………………… 34

Certificate of Compliance ………………………………… 36

# TABLE OF AUTHORITIES

## Cases

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)..................................................26

*Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071 (8th Cir. 2024).......................12

*Ass'n of Club Execs. of Dall., Inc. v. Dallas*, 83 F.4th 958 (5th Cir. 2023)..............4

*Bantam Books, Inc. v. Sullivan*, 372 U. S. 58 (1963) ..............................................22

*Bennett v. West Tex. State Univ.*, 799 F.2d 155 (5th Cir. 1986)..............................20

*Biden v. Nebraska*, 600 U.S. 477 (2023) ....................................................................5

*Cent. Pines Land Co. v. United States*, 274 F.3d 881 (5th Cir. 2001)................1, 19

*Chavez v. Plan Benefit Servs., Inc.*, No. 22-50368, 2024 U.S. App. LEXIS 17267
    (5th Cir. July 15, 2024)........................................................................................5

*Children's Health Defense v. Meta Platforms, Inc.*, 112 F.4th 742 (9th Cir. 2024)
    ............................................................................................................................29

*Columbia Gulf Transmission, LLC v. FERC*, 106 F.4th 1220 (D.C. Cir. 2024).....11

*Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 U.S. App. LEXIS
    19007 (5th Cir. July 25, 2023)................................................................ 11, 13, 16

*Cruz v. Skelton*, 543 F.2d 86 (5th Cir. 1976)...........................................................20

*Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846 (5th Cir.
    2022)...................................................................................................................20

*DOC v. New York*, 588 U.S. 752 (2019)...................................................................12

*Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167 (2000)...................................13

*Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891 (5th Cir. 2023) ..............12

*Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17 (2017) .......................17

*Hedges v. Obama*, 724 F.3d 170 (2nd Cir. 2013)....................................................21

*Janny v. Gamez*, 8 F.4th 883 (10th Cir. 2021).........................................................27

*Kennedy v. Biden*, No. 3:23-CV-00381, 2024 U.S. Dist. LEXIS 149217 (W.D. La.
    Aug. 20, 2024) .....................................................................................................6

*Larson v. Valente*, 456 U.S. 228 (1982) .................................................................11

*Lugar v. Edmondson Oil Co*, 457 U.S. 922 (1982) ................................................26

*Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231 (5th Cir. 2023) ................21

*Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023)....................................................1

*Missouri v. Biden*, No. 3:22-CV-01213, 2023 U.S. Dist. LEXIS 114585 (W.D. La. July 4, 2023)........................................................................................................4

*Murthy v. Missouri*, 144 S. Ct. 1972 (2024) ..................................................... passim

*National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024) ....................21

*Norman v. St. Clair*, 610 F.2d 1228 (5th Cir.1980)................................................20

*O'Shea v. Littleton*, 414 U. S. 488 (1974) ..............................................................13

*Penaflor v. Willis*, No. 3:21-cv-289, 2024 U.S. Dist. LEXIS 162311 (S.D. Tex. Sept. 10, 2024) ..................................................................................................21

*Ridley v. McCall*, 496 F.2d 213 (5th Cir. 1974) ....................................................20

*Sanchez v. R.G.L.*, 761 F.3d 495 (5th Cir. 2014).....................................................11

*SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458 (5th Cir. 2022)................7

*Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989) ...............................28

*Speech First, Inc. v. Fenves*, 979 F.3d 319 (5th Cir. 2020)...............................4, 12

*Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174 (5th Cir. 2023) ...............................................................................................................25

*Steel Co.* v. *Citizens for Better Environment,* 523 U.S. 83 (1998) ........................12

*Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399 (5th Cir. 2012) ......................................................................................................21

*Tex. Med. Ass'n v. Dep't of Health & Human Servs.*, 110 F.4th 762 (5th Cir. 2024) ......................................................................................................................21

*Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021)...........................................................20

*Texas v. United States*, 240 F.4th 205 (5th Cir. 2022)............................................34

*Texas v. United States*, 787 F.3d 733 (5th Cir. 2015)..............................................34

*U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912 (N.D. Cal. 2020)......15

*United States v. Perkins*, 99 F.4th 804 (5th Cir. 2024)...........................................20

*United States v. Texas*, 97 F.4th 268 (5th Cir. 2024)...............................................34

*Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U. S.
   748 (1976) ......................................................................................................18

**Statutes**

47 U.S.C. § 230 ....................................................................................................29

**Other Authorities**

DOJ, Memorandum from the Office of the Deputy Attorney General, July 12,
   2024, *reprinted in* DOJ, EVALUATION OF THE U.S. DEPARTMENT OF JUSTICE'S
   EFFORTS TO COORDINATE INFORMATION SHARING ABOUT FOREIGN MALIGN
   INFLUENCE THREATS TO U.S. ELECTIONS  appendix 7 (July 23, 2024) ...................2

INTERIM STAFF REPORT OF THE HOUSE JUDICIARY COMMITTEE, THE CENSORSHIP-
   INDUSTRIAL COMPLEX: HOW TOP BIDEN WHITE HOUSE OFFICIALS COERCED BIG
   TECH TO CENSOR AMERICANS, TRUE INFORMATION, AND CRITICS OF THE BIDEN
   ADMINISTRATION (May 1, 2024) ..........................................................................25

### *KENNEDY* PLAINTIFFS' OPPOSITION BRIEF

## INTRODUCTION

There is only one serious issue on this appeal: standing. And Defendants cannot win it. As to all other issues—the First Amendment merits, irreparable harm, and so on—this Court's wholly correct rulings in *Missouri v. Biden*, 83 F.4th 350 (5th Cir. 2023), are binding here and compel affirmance.[1]

Defendants cannot win on standing for a simple reason. The Supreme Court's decision rejecting standing in *Murthy v. Missouri*, 144 S. Ct. 1972 (2024), confirms standing here. Precisely what doomed standing for the *Murthy* plaintiffs establishes it for Plaintiffs Children's Health Defense ("CHD") and Robert F. Kennedy, Jr.:

- The *Murthy* Court emphasized that no Government defendant was shown to have been "behind" any particular social-media restriction imposed on any of the plaintiffs in that case, undercutting traceability. Here, as the evidence shows—and as the District Court has just found for the second time, on the basis of specific, unrebutted facts—several Defendants provably, coercively caused the censorship of both CHD and Kennedy, including

---

[1] Defendants commit a serious error of law when they say that this Court's *Missouri* opinion is no longer precedential because it was reversed in *Murthy*. (ECF No. 93 at 26.) In this Circuit (as elsewhere), an opinion reversed but not vacated by the Supreme Court remains precedential and binding on all matters other than the grounds (here, standing) upon which it was reversed. *See, e.g.*, *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 n.57 (5th Cir. 2001) (explaining "important difference between our treatment of a panel opinion after *vacatur* by the Supreme Court and our treatment when a judgment is reversed on other grounds" and stating that, unlike a vacated opinion, a decision "reversed on other grounds" still "binds us"). This Court's *Missouri* opinion was reversed in *Murthy*, but not vacated. *See infra* Point III (providing further authority on this point).

Facebook's and Instagram's complete and permanent deplatforming of CHD. (*See infra* Point II(B)(1).)

• The *Murthy* Court emphasized that the plaintiffs in that case had shown only ***past*** censorship of their speech, undercutting redressability. By contrast, the censorship of the *Kennedy* Plaintiffs is ***present and continuing***, which renders their standing unassailable. (*See infra* Point II(B)(2).)

There's more. In holding that standing had not been shown against the FBI and CISA because those two agencies had ceased their challenged social-media operations—i.e., their efforts to bring about social-media censorship of election-related speech, which this Court found unconstitutional in *Missouri*—the *Murthy* Court relied on the fact that "the Government has represented that it will not resume operations for the 2024 election." *Murthy*, 144 S. Ct. at 1993. But just two weeks after *Murthy* was handed down, the Department of Justice announced the "Resumption of FBI's Regular Meetings with Social Media Companies" and stated that the FBI's dealings with those companies would be conducted in the same "manner" as the "FBI did before pausing the meetings in summer 2023 due to the now-vacated *Missouri* injunction."[2]

This is a startling admission. The United States Government "paused" its

---

[2] DOJ, Memorandum from the Office of the Deputy Attorney General, July 12, 2024, at 3-4, *reprinted in* DOJ, EVALUATION OF THE U.S. DEPARTMENT OF JUSTICE'S EFFORTS TO COORDINATE INFORMATION SHARING ABOUT FOREIGN MALIGN INFLUENCE THREATS TO U.S. ELECTIONS appendix 7 (July 23, 2024), available at https://oig.justice.gov/reports/evaluation-us-department-justices-efforts-coordinate-information-sharing-about-foreign (hereafter DOJ Memorandum). CISA has also resumed operations. *See infra* Point II(B)(2).

social-media censorship operations while *Murthy* was pending, represented to the High Court that those operations would not resume for the 2024 election cycle, induced the Court to rely on that representation to find that the case presented no live case or controversy, ***then announced the resumption of those operations two weeks after the Court ruled***.  In other words, the Government appears at a minimum to have misled the Supreme Court; less generously expressed, the Government may have hoodwinked the Court. And as the unrebutted evidence submitted below shows, election-related social-media censorship targeting Mr. Kennedy exploded a few months ago, right after the FBI/CISA operations resumed. (*See infra* Point II(B)(2).) Surely the Government cannot be permitted to avoid a constitutional challenge to its conduct through such machinations.

### STATEMENT OF FACTS

The *Kennedy* Plaintiffs—Mr. Kennedy; prominent health-information nonprofit organization CHD; and healthcare professional Connie Sampognaro—filed this action in March, 2023 for one principal reason: to vindicate their freedom of speech in the event that the plaintiffs in *Missouri v. Biden* (now known as *Murthy v. Missouri*) were found to lack standing.  That eventuality has now come to pass.

The instant case, *Kennedy v. Biden*, comes to this Court on the very same voluminous record as in *Missouri v. Biden*. As a result, this Court is highly familiar with the years-long covert Federal Government social-media censorship campaign,

which the District Court called "arguably the most massive attack on the freedom of speech in United States history." *Missouri v. Biden*, No. 3:22-CV-01213, 2023 U.S. Dist. LEXIS 114585, at *158 (W.D. La. July 4, 2023). This Court is also familiar with the preliminary injunction issued below. (*See infra* Point VI.) Accordingly, the *Kennedy* Plaintiffs will not restate the case here.

## ARGUMENT

## I.     Standard of Review

This appeal is governed by the familiar preliminary injunction standards of review:

> "We review a preliminary injunction for abuse of discretion, reviewing findings of fact for clear error and conclusions of law *de novo*." *Tex. Alliance for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022) (citation omitted). To obtain a preliminary injunction, the Plaintiffs must show: (1) they are substantially likely to succeed on the merits; (2) a substantial threat of irreparable harm absent the injunction; (3) the threatened injury outweighs any harm caused by granting the injunction; and (4) the injunction is in the public interest.

*Ass'n of Club Execs. of Dall., Inc. v. Dallas*, 83 F.4th 958, 963 (5th Cir. 2023).

Plaintiffs bear the burden of proof on standing, but "[a]t earlier stages of litigation … the manner and degree of evidence required to show standing is less than at later stages. At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020) (citation omitted). The well-known elements of standing are "injury," "traceability," and "redressability." *Chavez v.*

*Plan Benefit Servs., Inc.*, No. 22-50368, 2024 U.S. App. LEXIS 17267, at *7 (5th Cir. July 15, 2024). Only a single plaintiff need have standing: "[i]f at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023).

## II.     Plaintiffs Have Standing.

### A.     Standing Prerequisites Established by *Murthy*

The Supreme Court in *Murthy* laid down two critical factual prerequisites for standing in cases like this one.

First, causation. "The primary weakness" in the *Murthy* plaintiffs' standing, the Court held, was "the lack of specific causation findings with respect to any discrete instance of content moderation. The District Court made none. Nor did the Fifth Circuit." *Murthy*, 144 S. Ct. at 1979. Critically, plaintiffs must show that a Government defendant was "behind" at least one social-media restriction imposed on them:

> If a plaintiff demonstrates that a particular Government defendant was behind her past social-media restriction, it will be easier for her to prove that she faces a continued risk of future restriction that is likely to be traceable to that same defendant. Conversely, if a plaintiff cannot trace her past injury to one of the defendants, it will be much harder for her to make that showing. In the latter situation, the plaintiff would essentially have to build her case from scratch, showing why she has some newfound reason to fear that one of the named defendants will coerce her chosen platform to restrict future speech on a topic about which she plans to post.

*Id*. at 1987. The *Murthy* majority went on to find that no plaintiff in that case had shown specific targeting or causation. *Id*. at 1988-92.

Second, the *Murthy* majority emphasized that the plaintiffs in that case had shown only "***past***" censorship, which does not in itself establish a redressable injury for purposes of prospective relief:

> "Past exposure to illegal conduct" can serve as evidence of threatened future injury but "does not in itself show a present case or controversy regarding injunctive relief"….
> … The plaintiffs rely on allegations of past Government censorship as evidence that future censorship is likely. But ... the events of the past do little to help any of the plaintiffs establish standing to seek an injunction to prevent future harms.

*Id*. at 1987 (citation omitted), 1988-89.

The instant case is utterly different. Here, the facts show that Defendants specifically targeted Kennedy and CHD for censorship, that particular Defendants were indeed "behind" their censorship, and that their censorship is not merely in the past, but is present and continuing today.

B.    **Plaintiffs Kennedy and CHD have standing**.

1. *Kennedy and CHD have shown causation and hence traceability*.

As the District Court has now expressly found, on the basis of a detailed discussion of record evidence, both Kennedy and CHD have shown that Defendants caused their censorship on social media platforms. *Kennedy v. Biden*, No. 3:23-CV-00381, 2024 U.S. Dist. LEXIS 149217, at *9-25 (W.D. La. Aug. 20, 2024). These

6

findings of causation are reversible only for clear error. "Questions of . . . causation[]

are factual issues, and may not be set aside on appeal unless clearly erroneous." *SCF*

*Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458, 477 (5th Cir. 2022) (ellipsis and

brackets in original).

Far from clearly erroneous, the District Court's causation findings are clearly

correct and amply supported by the record evidence. The unrebutted Holland

Declaration (A297-310) sets forth key facts.

In April 2021, in oral meetings with Facebook, the White House demanded

action against the so-called "Disinformation Dozen," twelve named individuals and

organizations, including Mr. Kennedy and CHD, accused (falsely) of being the

leading online disseminators of COVID-related "disinformation." Holland Dec. ¶¶ 10,

14. On May 1, Facebook emailed the White House resisting such deplatforming:

"[W]e continue to review accounts associated with the 12 individuals identified in the

… 'Disinformation Dozen' report, but many of those either do not violate our policies

or have ceased posting violating content." *Id*. Facebook further stated that

deplatforming the "Disinformation Dozen" could "reinforce the notion that there's a

cover-up." *Id*.

The White House responded with a threat. On May 5, 2021, the White House

Press Secretary told media that with respect to "the major platforms," President Biden

favors "a robust anti-trust program. So his view is that there's more that needs to be

done to ensure that this type of misinformation … is not going out to the American public." Holland Dec. ¶ 15. In other words, the Press Secretary directly linked the threat of an antitrust action with the White House demand for more aggressive censorship of COVID-related content. Few threats in the federal government's arsenal are more devastating to Meta than an antitrust break-up. Indeed, Mark Zuckerberg, Meta's founder and CEO, has referred to a federal antitrust action against Meta as "an existential threat" to his company. Holland Dec. ¶ 16.

The day after this threat, May 6, 2021, an email from White House Deputy Assistant Rob Flaherty again chastised Facebook for failing to censor the so-called Disinformation Dozen: "Seems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo dozen." Holland Dec. ¶ 17. Nevertheless, for the next two months, Facebook continued to resist deplatforming the twelve individuals and organizations (including Kennedy and CHD) targeted by the White House.

On July 15, at a joint press conference with Surgeon General Vivek Murthy, the White House Press Secretary demanded that platforms adopt "a robust enforcement strategy" against disfavored COVID information, again singling out the Disinformation Dozen: "[T]here's about 12 people who are producing 65 percent of anti-vaccine misinformation on social media platforms. All of them remain active on Facebook, despite some even being banned on other platforms, including … ones that Facebook owns." Holland Dec. ¶ 18.

8

The latter statement was (and would have been understood to be) a specific reference to Mr. Kennedy. At that time, Mr. Kennedy had been deplatformed from Instagram but not from Facebook. Holland Dec. ¶ 19. The next day, July 16, the President publicly stated that Facebook and other platforms were "killing people" due to their refusal to censor speech challenging the COVID vaccines' safety and efficacy. Holland Dec. ¶ 21. That same day, the White House Press Secretary reinforced the Administration's demand that Kennedy be banned across all platforms: "You shouldn't be banned from one platform and not others … for providing misinformation out there." *Id*.

A few days later, on July 20, 2021, White House Communications Director Kate Bedingfield linked President Biden's comment on "killing people" to an explicit threat of adverse regulatory action, including removal of "the liability protections granted by Section 230 of the Communications Decency Act." Holland Dec. ¶ 22; *see Kennedy*, 2024 U.S. Dist. LEXIS 149217, at *14. Immediately after this ratcheting up of the Administration's pressure, Facebook—which had for months resisted White House demands to deplatform the Disinformation Dozen—finally changed course and took aggressive action against them.

On July 23, 2021, just three days after the White House Communications Director's threat, Facebook emailed Surgeon General Murthy and stated, "I wanted to make sure you saw the steps we took just this past week"—i.e., since President

Biden's "killing people" comment on July 16, 2021—"to further address the 'disinfo dozen.'" Holland Dec. ¶ 24. Facebook reported to the Surgeon General that it had censored every member of the Disinformation Dozen, including Kennedy and CHD, in compliance with the White House's demands: "We removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen (so a total of 39 Profiles, Pages, Groups, and IG accounts deleted thus far, resulting in every member of the disinfo dozen having had at least one such entity removed)." *Id*.

But the Administration wanted more. The White House had publicly and privately stated that it wanted complete de-platforming (not removal of one "page" or "profile"), and in mid-August, with respect to CHD, the Government got what it sought. On August 18, 2021, Facebook again reported to the Surgeon General on additional censorship actions it was taking against the Disinformation Dozen. Holland Dec. ¶ 26. These actions included the ***complete deplatforming of CHD, which took place on August 17, 2021.*** Holland Dec. ¶¶ 5, 26.

These facts demonstrate that the District Court was correct to find that Facebook's censorship of the so-called "Disinformation Dozen" in mid-2021 was no coincidence, but was rather the direct result of coercive White House pressure. Indeed, even the *Murthy* Court itself acknowledged that the White House pressured Facebook to censor the Disinformation Dozen, specifically including Mr. Kennedy: "White House officials … pushed Facebook to remove the accounts of the

'disinformation dozen,' 12 people (including Kennedy) supposedly responsible for a majority of COVID–19-related misinformation." *Murthy*, 144 S. Ct. at 1991.[3] Accordingly, Kennedy and CHD have both established a likelihood of causation and therefore traceability at least as against the White House, the President, the Surgeon General, and the other White House Defendants.

> 2. *Kennedy and CHD have shown redressability because, unlike the* Murthy *plaintiffs, their censorship is present and ongoing.*

To establish redressability, a plaintiff is never required—even at the final, trial-stage of the proceedings—to show that the sought-for relief is "certain" to prevent injury. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982). Rather, ***if an injunction would "reduce the total amount of risk" of injury, "[s]uch a reduction satisfies the redressability required to establish standing."*** *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 U.S. App. LEXIS 19007, at *13 (5th Cir. July 25, 2023) (emphasis added) (citing *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When 'establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm.'"); *see also, e.g.*, *Columbia Gulf Transmission, LLC v. FERC*, 106 F.4th 1220, 1230 (D.C. Cir. 2024) (redressability established where relief sought will "***reduce the likelihood***" and

---

[3] Similar evidence exists showing a likelihood that YouTube's September 2021 deplatforming of CHD was also caused by White House pressure. *See* Holland Dec. ¶¶ 28-32.

"*risk*" of future injury) (emphasis added); *Animal Legal Def. Fund v. Reynolds*, 89 F.4th 1071, 1078 (8th Cir. 2024) ("Redressability exists when a favorable decision will relieve the plaintiffs of a discrete injury, even if it does not relieve them of every injury, *or if the risk of injury would be reduced [if the plaintiffs] received the relief they seek*.") (emphasis added).

At the preliminary injunction stage, where the "degree of evidence required to show standing is less than at later stages," plaintiff need "show only that" that such a reduction in risk is "likely." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329-30 (5th Cir. 2020). To show likely redressability, plaintiffs are permitted to rely "on the predictable effect of Government action on the decisions of third parties." *DOC v. New York*, 588 U.S. 752, 768 (2019).

The *Murthy* plaintiffs could not show redressability because they alleged only "past" censorship, rendering too speculative their claims of redressable future injury. *See Murthy*, 144 S. Ct. at 1988-89 ("The plaintiffs rely on allegations of past Government censorship as evidence that future censorship is likely."). But it is hornbook law that unlike past injury, a present, "continuing injury" *is* "sufficient to create standing for injunctive relief." *Gonzalez v. Blue Cross Blue Shield Ass'n*, 62 F.4th 891, 902 (5th Cir. 2023); *see also, e.g.*, *Steel Co.* v. *Citizens for Better Environment,* 523 U.S. 83, 109 (1998) (standing can be predicated on either "*present* or threatened injury") (emphasis added); *O'Shea v. Littleton*, 414 U. S. 488, 495-96

12

(1974) ("past" injury fails in itself to establish standing only "***if unaccompanied by any continuing, present adverse effects***") (emphasis added); *see, e.g.*, *Consumer Data Indus.*, 2023 U.S. App. LEXIS 19007, at \*7 n.6 (standing requires either "***present*** or threatened injury") (emphasis added) (citing *Friends of the Earth, Inc. v. Laidlaw*, 528 U.S. 167, 189-94 (2000)).

In contrast to the *Murthy* plaintiffs, Mr. Kennedy and CHD are still being censored by major social-media platforms. Initially deplatformed from Facebook and Instagram in August 2021, CHD remains deplatformed from Facebook and Instagram today. Holland Dec. ¶¶ 5, 26. Initially deplatformed from YouTube in September 2021, CHD remains deplatformed from YouTube today. Holland Dec. ¶ 6. The chain of causation here has never been broken: CHD's government-caused deplatforming from Facebook and YouTube remains completely unchanged today. And so far as the public record reveals, the Defendants have never assured those platforms that they would face no adverse governmental action if they were to reinstate CHD's accounts.

While Mr. Kennedy is not deplatformed, the social-media censorship inflicted on him is intense and intensifying. As detailed in the Rasmussen Declaration (A311-18), since early May, 2024, Meta has begun censoring Mr. Kennedy's political speech to an unprecedented extent. Rasmussen Dec. ¶ 4. In May, Meta blocked a thirty-minute film in which Mr. Kennedy spoke about his beliefs and values, and

Meta continues to shadow-ban that film today. Rasmussen Dec. ¶¶ 4-12. In late June and thereafter, Meta blocked Instagram and Facebook users from posting links to Kennedy campaign events. Rasmussen Dec. ¶¶ 20-22. Astoundingly, Meta even began blocking users' bare expressions of support for Mr. Kennedy, such as "Kennedy all the way!", "VOTE KENNEDY," and "Time to add Kennedy to the mix." Rasmussen Dec. ¶ 23. In every case, Meta has provided either no explanation of this censorship or patently false explanations (the same modus operandi Facebook followed when it censored the Hunter Biden laptop story). Rasmussen Dec. ¶¶ 9-10, 22, 26.

Moreover, there is evidence that this intolerable electoral interference has been caused by Defendants' resuming their communications with social media platforms. As the District Court found, *see Kennedy*, 2024 U.S. Dist. LEXIS 149217, at *18, in early May, 2024—*i.e.*, at the very same time that Meta began its intensifying burst of censorship against Mr. Kennedy's campaign—Sen. Mark Warren, chair of the Senate Intelligence Committee, "told reporters that federal agencies such as the FBI and Cybersecurity and Infrastructure Security Agency (CISA) [had] restarted discussions with Big Tech platforms."[4] The renewed coordination was said to be intended (once again) to cause social media platforms to

---

[4] The Federalist, *FBI Confirms It's Restarting Online Censorship Efforts Ahead Of 2024 Election Reason*, May 8, 2024, https://thefederalist.com/2024/05/08/fbi-confirms-its-restarting-online-censorship-efforts-ahead-of-2024-election.

14

"remov[e] disinformation on [their] sites as the November presidential election nears."[5] The DOJ has now confirmed this report, publicly announcing a resumption of the very same FBI's social-media election operations found unconstitutional by this Court in *Missouri*, following the "pausing" of those operations during the pendency of the *Murthy* Supreme Court appeal.[6]

As stated above, the *Murthy* Court relied on a contrary representation: "the Government has represented that it will not resume [its FBI and CISA social-media] operations for the 2024 election." *Murthy*, 144 S. Ct. at 1993. The Court's reliance on this misleading representation was critical to its redressability ruling, which rested on the supposition that Defendants' challenged conduct had ceased. But by the Government's own post-*Murthy* admission, it has not ceased, and redressability for Kennedy against the FBI and CISA is now satisfied.

Conclusive proof does not yet exist that the FBI's and CISA's resumed operations are the cause of Meta's recent intensifying election-related censorship of Mr. Kennedy. But conclusive proof is not the standard here. Given the past effectiveness of the FBI and CISA operations,[7] there can be no doubt that the

---

[5] *Id.*

[6] DOJ Memorandum, *supra* note 2, at 3-4. This Court may consider the DOJ memorandum either as a party admission or by judicial notice. *See, e.g.*, *U.S. WeChat Users Alliance v. Trump*, 488 F. Supp. 3d 912, 916 n.2 (N.D. Cal. 2020) ("the government [does] not contest that the court could consider—whether as a party admission or by judicial notice—the Secretary's statement or other public officials' statements").

[7] *See, e.g.*, *Missouri v. Biden*, 2023 U.S. Dist. LEXIS 114585, at *82-84, 89 (discussing CISA's "malinformation" team meetings with social media platforms which led, *inter alia*, to censorship

injunction against the FBI and CISA will "reduce the . . . risk" of election-related censorship of Kennedy going forward, satisfying redressability at the preliminary injunction stage. *See Consumer Data Indus.*, 2023 U.S. App. LEXIS 19007, at *13; *Sanchez v. R.G.L.*, 761 F.3d at 506.

Similarly, CHD's present, ongoing censorship—caused by Defendants—establishes redressability at this stage of the proceedings. CHD was completely deplatformed from Facebook, Instagram and Google as a direct result of White House threats, and that state of affairs has not changed since. In other words, ***Defendants are directly responsible for the injury CHD is currently suffering***, which completely distinguishes CHD from any of the *Murthy* plaintiffs, none of whom could claim a present, ongoing injury for which any Government defendant was directly, provably responsible. An injunction here will substantially increase the chances that CHD will be re-platformed, and that is more than enough to create a "present case or controversy." *Murthy*, 144 S. Ct. at 1987 (citation omitted).[8]

---

of the wholly-accurate Hunter Biden laptop story during election the 2020). The District Court more recently summarized meetings of the FBI with platforms resulting in a "50% success rate in having alleged election disinformation taken down or censored." (A245.) This Court also found the FBI/CISA social media operations highly effective—and unconstitutional. *See Missouri*, 83 F.4th at 388-89, 391.

[8] Defendants once again contend that the *Kennedy* Plaintiffs "waived" their direct-censorship standing by arguing earlier in this case that that they had right-to-listen standing. (ECF No. 93 at 16-17.) As before, this contention is absurd. To begin with, the District Court has twice expressly rejected it. A327. Moreover, direct-censorship was specifically pleaded in the Complaint. (*See, e.g.*, Complaint (A1) ¶ 305 ("After this series of public statements, responding to 'White House pressure,' Facebook censored the accounts of the 12 specific disfavored speakers (including Plaintiff Kennedy) whom Psaki accused of spreading health misinformation."); id. ¶ 435 ("In addition, as a result of Defendants' censorship campaign, Kennedy has also been directly censored

To summarize, the above facts establish likely standing for Plaintiffs Kennedy and CHD at a minimum against the White House Defendants, the Surgeon General, the FBI and CISA.[9]

### C.     **Plaintiff Sampognaro Has Right-To-Listen Standing**.

Although this Court need not reach the issue, Plaintiffs here briefly explain why they respectfully disagree with the District Court's conclusion that Plaintiff Sampognaro lacks standing. The Supreme Court rejected right-to-listen standing in *Murthy* because none of the *Murthy* plaintiffs had "identified any specific speakers or topics that they have been unable to hear or follow." *Murthy*, 144 S. Ct. at 1980-81. By contrast, Ms. Sampognaro has met this test.

Sampognaro is a potentially immuno-compromised health-care professional. Sampognaro Dec. ¶¶ 2-4. She relies on social media for health information for herself, her family, and her husband's cardiology patients, all of whom are "high risk." Sampognaro Dec. ¶ 5. She has identified three specific individuals and

---

on social media and de-platformed entirely from major platforms. Just recently, in March 2023, an important public political speech given by Kennedy in New Hampshire was blocked by YouTube and therefore could not be viewed by most online news consumers.").) Finally, "waiver is the intentional relinquishment or abandonment of a known right," *Hamer v. Neighborhood Hous. Servs. of Chi.*, 583 U.S. 17, 20 n.1 (2017), and the notion that Plaintiffs knowingly waived their claim to direct-censorship standing under *Murthy*—which had ***not yet been decided***—is a legal impossibility. *Murthy* has newly set forth how a direct-censorship standing claim is to be established in cases like these; as a matter of logic, law and common sense, Plaintiffs cannot have waived a claim arising under a case that had not yet been decided.

[9] As shown below, other theories of state action in addition to coercion (which was the primary basis for the causation findings in the District Court) are also supported by the record here, and under these additional theories of state action, Plaintiffs have established standing against the CDC as well. *See infra* Point IV(B)(4).

17

organizations she particularly relies on for "valuable," "hard-to-find" information and viewpoints about healthcare challenging the "orthodox" narrative, particularly for information concerning adverse effects of the COVID vaccines as well as vitamins, supplements and alternative medicines that could boost a person's immune citizen. Sampognaro Dec. ¶ 8. The identified individuals and organizations are Children's Health Defense, Dr. Joseph Mercola, and GreenMedInfo—all members of the so-called "Disinformation Dozen," whom Defendants caused social-media platforms to censor and who remain censored on social media today, with their content frequently hidden, demoted, or otherwise made difficult to find. Sampognaro Dec. ¶ 8, 12. Sampognaro points out that while the COVID pandemic crisis may have passed, the disease is still prevalent and dangerous for immuno-compromised individuals, and that the COVID vaccines are still being recommended. Sampognaro Dec. ¶ 12. As a result, social media censorship prevents her "from accessing information from sources" she wants to listen to "on a subject of life-or-death importance." Sampognaro Dec. ¶¶ 11-12.

Thus Ms. Sampognaro has established a likelihood of right-to-listen standing under well-settled Supreme Court precedent. As the High Court put it in *Murthy*, "in *Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, [425 U. S. 748, 756–757 (1976),] we concluded that prescription-drug consumers had an interest in challenging the prohibition on advertising the price of those drugs."

*Murthy*, 144 S. Ct. at 1996. Like the prescription-drug consumers in Virginia, Ms. Sampognaro has a concrete, life-or-death interest in challenging government-induced censorship of medical information.

## III.    All of Defendants' Other Arguments are Foreclosed by *Missouri*

All of Defendants' other arguments fly in the face of this Court's holdings in *Missouri v. Biden*. The record in this case is not merely similar to the *Missouri* record; it's the *same* record. Because *Missouri* remains binding precedent here, and because *Missouri* found on identical facts a substantial likelihood of state action, of numerous First Amendment violations, and of irreparable harm, Defendants' arguments on all these points are foreclosed.

Defendants erroneously contend that this Court's decision in *Missouri v. Biden* is no longer binding because it was reversed in *Murthy*. Their claim contradicts controlling Fifth Circuit case law. In *Central Pines Land Co. v. United States*, 274 F.3d 881 (5th Cir. 2001), this Court explained the "important difference between our treatment of a panel opinion after *vacatur* by the Supreme Court and our treatment when a judgment is reversed on other grounds." *Id*. at 783 n.57. Unlike a vacated opinion, which is no longer precedential, a decision "reversed on other grounds" still "binds us." *Id*. Because this Court's *Missouri* decision was reversed but not vacated by *Murthy*, it remains binding precedent on all matters other than standing, the sole issue reached by the *Murthy* majority.

*Central Pines* is no outlier. On the contrary, this Court has repeatedly adhered to the *Central Pines* rule. *See, e.g.*, *Data Mktg. P'ship, LP v. United States Dep't of Labor*, 45 F.4th 846, 856 n.2 (5th Cir. 2022) (citing *Central Pines* and holding that *Texas v. Biden*, 20 F.4th 928, 993 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022), remains "binding" in this Circuit "on all grounds not reversed"); *see also, e.g.*, *United States v. Perkins*, 99 F.4th 804, 817 (5th Cir. 2024) (treating as binding precedent a prior Fifth Circuit case reversed by Supreme Court on other grounds). Every case misleadingly cited by Defendants for the proposition that an overtuned case is no longer binding involved a decision not only reversed by the Supreme Court, but also vacated.[10]

Without acknowledging that they are calling for a radical departure from existing law, Defendants make the novel claim that a case reversed "for a jurisdictional reason" is not binding even though it hasn't been vacated. (ECF No. 93 at 27.) Defendants cite no case so holding and fail to alert this Court to Fifth Circuit authority (of which Defendants are aware) contradicting their argument. *See, e.g.*, *Norman v. St. Clair*, 610 F.2d 1228, 1239 (5th Cir.1980) (relying on past Fifth Circuit case "reversed [by the Supreme Court] on jurisdictional grounds");[11] *accord,*

---

[10] Defendants cite "*Ridley v. McCall*, 496 F.2d 213, 214 (5th Cir. 1974) (per curiam); *Cruz v. Skelton*, 543 F.2d 86, 88-89 (5th Cir. 1976); [and] *Bennett v. West Tex. State Univ.*, 799 F.2d 155, 159 n.3 (5th Cir. 1986)," but as Defendants themselves acknowledge, all these cases involved "*vacatur*" (not merely reversal) of prior decisions. (ECF No. 93 at 26-27 (emphasis added).)

[11] Defendants are aware of *Norman v. St. Clair* because Plaintiffs cited it in their previous brief. *See* ECF No. 74 at 17-18 n.11.

*e.g.*, *Hedges v. Obama*, 724 F.3d 170, 193 n.137 (2nd Cir. 2013) (treating as precedential prior Second Circuit case "*rev'd on jurisdictional grounds*"). There are literally thousands of federal cases citing and relying on past Circuit Court decisions as precedent even though those decisions had been "rev[erse]d on other grounds" by the Supreme Court.[12] Defendants do not cite a single case holding or even hinting that such reliance is erroneous when the reversal was jurisdictional, and Plaintiffs are aware of none.

As a last-ditch effort, Defendants contend that *Missouri* is no longer binding because it has somehow been "undercut" on the state-action and First Amendment merits by *Murthy* and by the Supreme Court's ruling in *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024). (ECF No. 93 at 13.) But Defendants are piling error onto error. As this Court has repeatedly held, "'for a Supreme Court decision to change our [c]ircuit's law, ***it must . . . unequivocally overrule prior precedent***.'" *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023) (emphasis added) (brackets and ellipsis in original) (quoting *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012)). There has been nothing close to an unequivocal overruling here.

---

[12] For just a few recent in-Circuit examples, see *Tex. Med. Ass'n v. Dep't of Health & Human Servs.*, 110 F.4th 762, 779 (5th Cir. 2024); *Perkins*, 99 F.4th at 817; *Penaflor v. Willis*, No. 3:21-cv-289, 2024 U.S. Dist. LEXIS 162311, at *13 (S.D. Tex. Sept. 10, 2024).

The *Murthy* majority expressly stated that it was not "reach[ing] the merits." *Murthy*, 144 S. Ct. at 1985. Indeed, for avoidance of any possible doubt, the majority added: "Because we do not reach the merits, we express no view as to whether the Fifth Circuit correctly articulated the standard for when the Government transforms private conduct into state action." *Id*. at 1985 n.3. On top of that, all three Justices in *Murthy* who did reach the merits ***agreed*** with this Court's conclusions. *See id*. at 2015 (Alito, J., dissenting). A majority that expressed no view on the merits, combined with three Justices who agreed with this Court on the merits, obviously does not add up to an unequivocal overruling.

And *Vullo*, far from overruling *Missouri*, actually supports it, as Justice Alito pointed out in *Murthy*:

> As the Court held more than 60 years ago in *Bantam Books, Inc. v. Sullivan*, 372 U. S. 58 (1963), the Government may not coerce or intimidate a third-party intermediary into suppressing someone else's speech. *Id*., at 67. Earlier this Term, we reaffirmed that important principle in *National Rifle Association v. Vullo*, 602 U. S., at 187-191. As we said there, "a government official cannot do indirectly what she is barred from doing directly," *id*., at 190.

144 S. Ct. at 2010 (Alito, J., dissenting) (parallel citations omitted). Justice Alito went on to discuss the "three leading factors" that the *Vullo* Court had used to "distinguish between permissible persuasion and unconstitutional coercion," finding that "all three factors point[ed] to coercion" here. *Id*. Given that the three Justices who reached the merits in *Murthy* relied at length on *Vullo* to support this Court's

conclusions in *Missouri*, the notion that *Vullo* somehow unequivocally overruled *Missouri* is frivolous.

Accordingly, all of *Missouri*'s conclusions apart from standing remain binding in this Circuit, including *Missouri*'s rulings on the First Amendment merits, on the equitable factors, and on the propriety of injunctive relief. Thus, upon a finding that any one of the *Kennedy* Plaintiffs has standing, this Court should and must affirm.

## IV. **Plaintiffs Have Established a Likelihood of Success on the Merits**.

### A. **The facts demonstrating coercion here are overwhelming**.

Even if this Court's *Missouri* decision were not binding (which it is), its detailed, thorough and closely-reasoned holdings would remain highly persuasive, and in any event the facts demonstrating a likelihood of coercion here are overwhelming.

As shown above, Facebook for months resisted deplatforming the "Disinformation Dozen" (including Plaintiffs Kennedy and CHD), then finally did so only after Defendants subjected it to two devastating threats—an antitrust break-up and the loss of Section 230 immunity. The District Court so found, and that purely factual finding must be upheld because it is not clearly erroneous. There can no serious dispute that a private party who refuses to carry third parties' speech—or indeed engages in any other conduct—because of governmental threats has been

coerced within the meaning of state action doctrine. *See Vullo*, 602 U.S. at 191; *Bantam Books*, 372 U.S. at 67.

And the coercion here was far broader than that. As this court stated in *Missouri*, threats and heavy-handed pressure were applied repeatedly by White House officials in a never-ending barrage of communications with social-media platforms:

> [T]he officials made express threats and, at the very least, leaned into the inherent authority of the President's office. The officials made inflammatory accusations, such as saying that the platforms were "poison[ing]" the public, and "killing people." The platforms were told they needed to take greater responsibility and action. Then, they followed their statements with threats of "fundamental reforms" like regulatory changes and increased enforcement actions that would ensure the platforms were "held accountable." But, beyond express threats, there was *always* an "unspoken 'or else.'" After all, as the executive of the Nation, the President wields awesome power. The officials were not shy to allude to that understanding native to every American—when the platforms faltered, the officials warned them that they were "[i]nternally . . . considering our options on what to do," their "concern[s] [were] shared at the highest (and I mean highest) levels of the [White House]," and the "President has long been concerned about the power of large social media platforms."…[T]he language deployed in the officials' campaign reveals clear "plan[s] to punish" the platforms if they did not surrender. Consequently, the four-factor test weighs heavily in favor of finding the officials' messages were coercive, not persuasive.

*Missouri*, 83 F.4th at 385-86 (citations omitted).

Defendants' contrary, self-serving claims—that the Government's censorship campaign was merely informational, an offer of friendly advice—simply refuse to come to grips with the record of threats and high-pressure tactics deployed here. Not that any further evidence is necessary, but just weeks ago, Meta CEO Zuckerberg

24

publicly acknowledged in a letter to Congress that the White House had subjected Facebook to "repeated pressure" to censor COVID-related content—indeed, even "humor" and "satire" that the Government didn't like.[13]  As this Court pointed out in *Missouri*, "it is not necessary that the recipient [of the government's communications] 'admit that it bowed to government pressure.'" *Missouri*, 83 F.4th at 381. But where the recipient ***has*** admitted it—and Zuckerberg's letter was not the first such admission by Facebook[14]—coercion cannot be seriously disputed.

B.    **Affirmance is warranted on the basis not only of coercion, but of other state action tests as well**

This Court can and should affirm the preliminary injunction granted below on the basis not only of coercion, but of other state action theories as well. *See Springboards to Educ., Inc. v. McAllen Indep. Sch. Dist.*, 62 F.4th 174, 178 (5th Cir. 2023) (appellate court may affirm on any basis supported by the record).

---

[13] Zuckerberg's letter to Representative Jim Jordan, Chair of the U.S. House of Representatives' Committee on the Judiciary, stated that "[i]n 2021, senior officials from the Biden Administration, including the White House, repeatedly pressured our teams for months to censor certain COVID-19 content, including humor and satire." CNN, *Mark Zuckerberg says Meta was 'pressured' by Biden administration to censor COVID-related content in 2021*, Aug. 27, 2024, https://www.cnn.com/2024/08/27/business/mark-zuckerberg-meta-biden-censor-covid-2021/index.html.

[14] *See Murthy*, 144 S. Ct. at 1998 n.2 (Alito, J., dissenting) (quoting Facebook internal email). "In July 2021, when Facebook executive Nick Clegg asked a Facebook employee why the company censored the man-made theory of the SARS-CoV-2 virus, the employee responded: 'Because we were under pressure from the [Biden] administration and others…. We shouldn't have done it.'" INTERIM STAFF REPORT OF THE HOUSE JUDICIARY COMMITTEE, THE CENSORSHIP-INDUSTRIAL COMPLEX: HOW TOP BIDEN WHITE HOUSE OFFICIALS COERCED BIG TECH TO CENSOR AMERICANS, TRUE INFORMATION, AND CRITICS OF THE BIDEN ADMINISTRATION, at 2, 13-14 (May 1, 2024), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Censorship-Industrial-Complex-WH-Report_Appendix.pdf.

1.   *Significant encouragement*

First, as this Court found in *Missouri*, the White House, the Surgeon General, the FBI, CISA, and the CDC all engaged in unconstitutional "significant encouragement" of social-media platform censorship, which the Court defined as the "exercise" of "active, meaningful control over the private party's decision," for example through substantial "entanglement in a party's independent decision-making." *Missouri*, 83 F.4th at 380, 388-91. Because *Missouri* remains precedential on all issues other than standing, this Court is bound by that finding and should affirm the preliminary injunction on this ground as well.

2.   *Agreement/Conspiracy*

Second, affirmance is also warranted under an "agreement" (or "conspiracy") theory of state action. *See, e.g.*, *Lugar v. Edmondson Oil Co*, 457 U.S. 922, 931 (1982) ("private party's joint participation with a state official in a conspiracy" constitutes "state action"); *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 150 (1970) ("petitioner will have made out a violation of her Fourteenth Amendment rights … if she can prove that a Kress employee … and a Hattiesburg policeman somehow ***reached an understanding*** to deny Miss Adickes service in the Kress store … because she was a white person in the company of Negroes") (emphasis added). State action is established "via conspiracy" where plaintiff "demonstrate[s] the public and private actors ***reached agreement upon 'a common, unconstitutional***

*goal,' and took 'concerted action' to advance that goal.*" *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021) (emphasis added)).

The detailed findings made by the court below and by this Court in *Missouri* leave no doubt that a likelihood of agreement-based state action has been established here. Facebook, Google, and Twitter all eventually "reached an understanding" and came to an "agreement" with the Defendants to censor protected speech, and extensive "concerted action" followed thereafter. The CDC's engagement with social media platforms provides a vivid example.

As set forth in the Holland Declaration, in 2019 and 2020, both the CDC and Facebook openly admitted that they had formed a working "partnership" to censor health-related and especially COVID-related speech that the CDC (often incorrectly) deemed "misinformation." (Holland Dec. ¶¶ 33-34, App. 309-10.) In late December, 2019, a CDC officer testified before Congress that the CDC "will work with local partners, using trusted messengers, to establish new partnerships and contain the spread of misinformation. To advance this, we've recently collaborated with social media companies like Pinterest and Facebook." (Holland Dec. ¶ 33; *see* House Energy and Commerce Subcommittee on Oversight and Investigations, Dec. 4, 2019, https://www.cdc.gov/washington/testimony/2019/t20191204.htm.) On its website, the CDC publicly states that it has "engaged" private "partners" to "contain the spread of [vaccine] misinformation" and "stop myths," and that it is "work[ing]

27

with social media companies" to achieve this goal. (Holland Dec. ¶ 33; *see* CDC, Vaccinate with Confidence, https://www.cdc.gov/vaccines/partners/vaccinate-with-confidence.html). In September 2020, Facebook CEO Zuckerberg said that his company, "work[s] with the CDC" to "remove" supposed "misinformation" as identified by the CDC. (Holland Dec. ¶ 34.) Based on these party admissions, it is highly likely that Plaintiffs will be able to prove: that Facebook and the CDC "reached an agreement" to work together and censor constitutionally protected health-related speech; that extensive "concerted conduct" followed; and that this concerted conduct resulted in First Amendment harms, including harms suffered directly by Kennedy and CHD.

### 3.    *Skinner-based state action*

Finally, this Court should also affirm the preliminary injunction granted below under *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602 (1989). In *Skinner*, the Supreme Court found state action in employee urine and blood testing conducted by private railway companies where: (1) a federal regulation immunized the companies from liability if they conducted such tests (2) the Federal Government had "made plain" its "strong preference" that the tests be carried out, and (3) the Government had also "made plain" a "desire" to participate in the test results. 489 U.S. at 615. All these factors are present here.

First, a federal statute—the famous Section 230—expressly immunizes social

media companies from liability if they censor "constitutionally protected" speech. 47 U.S.C. § 230(c)(2)(A). Second, through the innumerable messages sent by Defendants to social-media platforms (detailed by the District Court and by this Court in *Missouri*), the Federal Government "made plain" its "strong preference" that censorship of specific COVID- and election-related speech be carried out. Finally, Defendants not only expressed the "desire" to participate in and "share the fruits" of, but did in fact participate and share the fruits of, the platforms' censorship process, decision-making, and policies. *Skinner*, 489 U.S. at 615.

For just these reasons, in an important dissenting opinion issued last month, Judge Collins of the Ninth Circuit discussed *Skinner* at length and found that *Skinner* dictated a finding of state action on virtually the same facts that this Court is reviewing here. *See Children's Health Defense v. Meta Platforms, Inc*., 112 F.4th 742, 2024 U.S. App. LEXIS 20053, at *86-99 (9th Cir. 2024) (Collins, J., concurring in part and dissenting in part). As Judge Collins pointed out:

> Meta's … massive and widely available platforms for the hosting of the speech of enormous numbers of third parties … exist and operate *only* by virtue of the immunity conferred by § 230. Thus, the authority to manage content on such mega-platforms is, in a very real sense, a government-conferred power, and the Government, through its broad preemption of "state laws, rules, or regulations covering the same subject matter," has intentionally "removed all legal barriers" to Meta's exercise of that power over the speech of others. *Skinner*, 489 U.S. at 615. And, as in *Skinner*, that government-conferred power is one that, by its very design, is specifically directed at third-party rights that are protected under the Constitution from encroachment by the Government. In that sense, the immunized power conferred is not akin, for example, to the generic benefits of the liability limitations of the corporate

29

form. Section 230, by its structure and design, grants an immunized power specifically directed at censoring the speech of others.

*Id*. at 91-92. Indeed, the instant facts present an even stronger case of state action than those in *Skinner*, because in addition to the Government's expressing a "strong preference" for censorship, Defendants here went much further, applying pressure on the platforms and working hand-in-glove with them to achieve the censorship the Government desired.

This combination of immunity, pressure, and close collaboration makes a finding of state action ineluctable. If the Federal Government passed a statute immunizing private airline companies from liability for refusing to carry any passengers they deem "objectionable" (the term used in Section 230), then expressed a "strong preference" that those companies refuse to carry a certain class of passengers on a constitutionally forbidden basis—for example, Muslim passengers or passengers who criticized government policy—then sent haranguing messages pressuring those companies to exclude those passengers, and finally began working hand-in-glove with those companies to identify the passengers to be excluded, no court in the country would fail to find a sufficient nexus to turn the airlines' conduct into state action.  The same result obtains here.

4.     *Consequences for Standing*

Each and all of these additional state action theories have important consequences for standing. As just shown, the *Kennedy* Plaintiffs have established

30

not only a coercion-caused injury, but also a likelihood of injury under the significant encouragement, agreement/conspiracy, and *Skinner* tests for state action as well. Importantly, the governmental conduct underlying these state action tests ***has not abated***. *See, e.g.*, CDC, Vaccinate with Confidence, https://www.cdc.gov/vaccines/partners/vaccinate-with-confidence.html (stating that CDC "partners" and "work[s] with" "social media companies" to "contain the spread of [vaccine] misinformation"). Thus on the basis of these other state action tests, the *Kennedy* Plaintiffs have additional grounds for standing against all the Defendants enjoined by the District Court, including the FBI, CISA, and the CDC, regardless of whether the Defendants have put on "pause" their coercive tactics.

Moreover, and perhaps even more important, the facts showing likely CDC significant encouragement of social-media censorship dating back to late 2019 and 2020 undercuts Defendants' notion that the platforms' censorship of COVID-related speech prior to the White House's involvement (which began in 2021) demonstrates that the platforms have been exercising their "independent judgment" all along. (*See* ECF No. 93 at 32 (arguing that because "some of the content-moderation policies at issue predated communications with the White House," the platforms were exercising "their independent judgment").) Contrary to Defendants' claims, the platforms' pre-2021 censorship of COVID-related speech—such as their suppression of the lab-leak theory of COVID's origins—by no means establishes

that the platforms were exercising "independent judgment." Instead, it reflects the CDC's pre-2021 hand-in-glove collaboration with the platforms, which was (and remains) unconstitutional under the significant encourage, agreement/conspiracy, and *Skinner* tests for state action.

## V.    **The Equities Strongly Favor Plaintiffs.**

This Court's binding decision in *Missouri* forecloses Defendants' claim that the equitable factors favor them. The *Missouri* Court discussed each equitable factor in detail and found that all of them strongly favored the issuance of a preliminary injunction. *See Missouri*, 83 F.4th at 393 ("Deprivation of First Amendment rights, even for a short period, is sufficient to establish irreparable injury.") (citations omitted); *id*. at 394 ("Because '[i]njunctions protecting First Amendment freedoms are always in the public interest,' the equities weigh in Plaintiffs' favor.") (citation omitted). These wholly correct conclusions apply equally here.

Indeed, the equities favoring an injunction in this case are even stronger than in *Missouri*. As shown above, the censorship Defendants brought about against CHD and Kennedy continues to this day, and Kennedy is a candidate in the current presidential race. Thus the need for injunctive relief in this case is immediate and overwhelmingly strong. *See FEC v. Cruz*, 596 U.S. 289, 302 (2022) (First

Amendment "has its fullest and most urgent application precisely to the conduct of campaigns for political office").[15]

## VI. The Injunction Ordered Below Is in Strict Conformity with the Modified Injunction Ordered by this Court in *Missouri*

The preliminary injunction issued below reads as follows:

> [T]he White House Defendants, Surgeon General Defendants, CDC Defendants, FBI Defendants, and CISA Defendants, and their employees and agents, shall take no actions, formal or informal, directly or indirectly, to coerce or significantly encourage social-media companies to remove, delete, suppress or reduce, including through altering their algorithms, posted social-media content containing protected free speech. That includes, but is not limited to, compelling the platforms to act, such as by intimating that some form of punishment will follow a failure to comply with any request, or supervising, directing, or otherwise meaningfully controlling the social-media companies' decision making process.

(A249.) Defendants object that this language is so "broad," and formulated in such "general terms," that it "violate[s] Federal Rule of Civil Procedure 65(d)." (ECF No. 93 at 51.) What Defendants fail to mention is that the District Court's injunction is virtually ***identical*** to the modified injunction issued by this Court in *Missouri*. *See Missouri*, 83 F.4th at 397. Once again, because *Missouri* remains precedential on all

---

[15] Defendants claim that Kennedy's "suspension of [his presidential] campaign undermines any showing of irreparable injury." (ECF No. 93 at 46 n.7.) Not at all. First, Defendants are simply ignoring this Court's finding of irreparable harm in *Missouri*, where no plaintiff was a presidential candidate. Second, the government-caused deplatforming of CHD is itself irreparable harm, because any deprivation of First Amendment rights "is sufficient to establish irreparable injury." *Missouri*, 83 F.4th at 393. And finally, perhaps most important of all, a suspended campaign is not a terminated campaign. In 1992, presidential candidate Ross Perot suspended his campaign in July, returned to the race in October, and won nearly 20 percent of the vote in November. *See* CNN, Reform Party: Political Timeline 1992, https://www.cnn.com/ALLPOLITICS/1996/conventions/long.beach/perot/political.timeline.shtml.

matters other than standing, the *Missouri* Court's findings regarding the propriety and necessity of this injunction are binding and compel affirmance here.

## VII.  The Court Should Deny Defendants' Motion for a Stay Pending Appeal

Also before the Court is Defendants' motion for a stay pending appeal. The standards governing Defendants' stay motion are essentially the same as the those governing Plaintiffs' preliminary injunction motion, except that on each issue, Defendants bear the burden of proof:

> When asked to consider whether to grant a stay, this court determines "(1) whether the applicant has made a strong showing of likelihood to succeed on the merits; (2) whether the movant will be irreparably harmed absent a stay; (3) whether issuance of a stay will substantially injure other interested parties; and (4) where the public interest lies." [The movant's] burden is a substantial one, as a stay is "an extraordinary remedy."

*Texas v. United States*, 240 F.4th 205, 215 (5th Cir. 2022) (citations omitted).

"A stay pending appeal 'is not a matter of right, even if irreparable injury might otherwise result.'" *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024) (citations omitted). Defendants cannot prevail if their likelihood of success is a close call; on the contrary, they "must make a 'strong showing.'" *Id.* (citation omitted). This burden of proof is fully applicable to the issue of standing. *See, e.g.*, *Texas v. United States*, 787 F.3d 733, 747 (5th Cir. 2015) (denying stay) ("We begin by deciding whether the government has made a strong showing that it is likely to succeed on the merits of its claim that the states lack standing. It has not done so.").

Because, as shown above, Plaintiffs have established a likelihood of standing, success on the merits, irreparable harm, and a favorable balance of equities, it follows necessarily that Defendants cannot have carried their burden of showing the opposite. Accordingly, this Court should lift the existing administrative stay and deny Defendants' motion for a stay pending appeal.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for a stay and affirm the District Court's preliminary injunction.

DATED: September 25, 2024       Respectfully Submitted,

*/s/ Jed Rubenfeld*

JED RUBENFELD
NY Bar # 2214104
1031 Forest Road
New Haven CT 06515
Telephone: 203-432-7631
E-mail: jed.rubenfeld@yale.edu

G. SHELLY MATURIN, II
(La. Bar#26994)
Welborn & Hargett, LLC
1031 Camellia Blvd
Lafayette, LA 70508
Telephone: (337) 234-5533
E-mail: shelly@wandhlawfirm.com

Attorneys for ROBERT F. KENNEDY, JR.
CHILDREN'S HEALTH DEFENSE
CONNIE SOMPAGNARO

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), I certify that this brief complies with Federal Rule of Appellate Procedure 27(d)(1)(E) because it has been prepared in the proportionally-spaced 14-point Times Roman font, and that it complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains less than 9,000 words, according to Microsoft Word.

*/s/ G. Shelly Maturin, II*
G. SHELLY MATURIN, II (#26994)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 5, 2024, the above Brief in Opposition to Defendants' Renewed Motion for Stay was filed with this Court via the CM/ECF system, which will send notice of said filing to all counsel of record.

Dated: Sept. 25, 2024

*/s/ G. Shelly Maturin, II*
G. SHELLY MATURIN, II (#26994)
WELBORN & HARGETT, LLC
1031 Camellia Blvd.
Lafayette, LA 70508
Telephone: (337) 234-5533
Facsimile: (337) 769-3173
shelly@wandhlawfirm.com